In re Harry TESMETGES, a/k/a Theo Haris Henry Best, Harry Thomas, Debtor,

Robert MUSSO, Trustee, Plaintiff-Appellee,

v.

Harry TESMETGES, Mary J. Lombard, Arcadia Realty Corporation, Defendants-Appellants.

No. CV–84–3001. Bankruptcy No. 180–07354. Adv. No. 183–0085.

United States District Court, E.D. New York.

Dec. 17, 1984.

Law Firm of Ira H. Liebowitz, Lasky & Peterson, Garden City, N.Y., by Barry M. Lasky, Garden City, N.Y., for defendants-appellants Tesmetges, Lombard & Arcadia.

Philip M. Kovitz, New York City, for trustee-plaintiff-appellee.

## MEMORANDUM AND ORDER

PLATT, District Judge.

This action comes here on appeal by the debtor and defendants and on cross-appeal by the Trustee from a decision rendered by Judge Manuel J. Price of the U.S. Bank-ruptcy Court of the Eastern District of New York after a three day trial held in January of 1984. In that decision, Judge Price awarded the Trustee an equitable lien of $18,559.95 on the property held by the debtor's sister. For the reasons stated below, both the appeal and cross-appeal are denied and the decision of the Bankruptcy Judge is affirmed.

*Background*

The debtor, Harry Tesmetges, filed for voluntary bankruptcy under Chapter 7 on November 28, 1980. In February of 1982, the Trustee in Bankruptcy, Robert Musso, filed a complaint which was subsequently amended in March of 1983, seeking to have certain improved property consisting of a residential dwelling located at 168–44 89th Avenue, Jamaica, New York, declared to be that of the debtor's on the grounds that the debtor's transference of title to his sister for no consideration in 1972 was a fraudu-lent conveyance. Alternatively, the Trus-tee sought a ruling declaring that the debt-or's estate included an equitable lien re-tained on the 89th Avenue property to the extent of the payments made by him on the property through November of 1983 after transferring title in 1972.

According to Judge Price, the Trustee subsequently withdrew his declaratory judgment action based on his fraud claim, and thus, the only issue before Judge Price was whether and to what extent an equita-ble lien existed on the 89th Avenue proper-ty in favor of the Trustee. *In the Matter of Harry Tesmetges*, No. 180–07354, Adv. Pro. No. 182–0085, Slip Op. at 28 (Bkrtcy.E.D.N.Y. June 22, 1984). It should be noted that the Trustee, in the present appeal, claims that he did not intend to drop his declaratory judgment action and that it was error for Judge Price to find that he had not preserved it.

Before proceeding further, it will be use-ful at this point to summarize the owner-ship history of the 89th Avenue property as the debtor alleged it to have existed and then, review the events in which the Bank-ruptcy Judge found contrary evidence.

The debtor claimed that at the time of his sister Mary's second marriage at age 19 in 1965, his parents transferred the 89th Avenue property to him. Title to the property was allegedly given to him to hold for his sister as her dowry [1] because of her minority and because her parents wanted to determine whether her second marriage would be "successful" before delivering the title to her. The second reason proffered for giving the debtor title was because his parents had wanted to take out a mortgage on the property in order to give their daughter the money; however, because they were unable to take out a mortgage, they asked their son to do it. The debtor alleged that this was his reason for taking out an $11,000 mortgage from Greenpoint Savings Bank shortly after receiving title. The money was allegedly used by his sister and her new husband, William Lombard, as a down payment on the new home they were purchasing.

Between 1965 and 1972, the debtor paid the real estate and water taxes on the property and made payments on the mortgage. In May of 1972, the debtor transferred the title of the property to his solely owned corporation, Arcadia Realty. Then, on behalf of Arcadia, the debtor took out a second mortgage on the property for $22,-000. Shortly thereafter, in September of 1972, the debtor transferred the title of the property to his sister for the alleged reason of fulfilling his parents' intent to give his sister a dowry. Between 1972 and November of 1983, three years after his bankruptcy filing, the debtor continued paying the taxes on the property and making payments on the first mortgage and the second until 1977. The debtor's sister first learned of this second mortgage in 1977 when its holder threatened to foreclose on the property because the debtor had fallen in arrears on his payments. The debtor's sister paid the amount due and owing on this second mortgage.

Finally, the debtor alleged that the monies used to pay the taxes and first mortgage on the property came from his mother's social security checks; he claimed that he had merely acted as a conduit for her by cashing her checks and making these payments on her behalf as a means of completing his parents' gift of a dowry to his sister.

Having summarized the debtor's version of the ownership history of the 89th Avenue property, we may now review the aspects in its history which the Bankruptcy Judge found to be contrary to the debtor's version. First of all, Judge Price found no evidence to substantiate the debtor's allegation that the $11,000 first mortgage was ever given to his sister and her new husband to purchase a home. *In the Matter of H. Tesmetges*, slip op. at 4–5, 9–12, 21–22. The newlywed couple executed their own mortgage for $18,000 two weeks *before* the debtor executed the first mortgage; moreover, at the time the couple executed the mortgage, they claimed to have only received about $6,000 in wedding gifts. *Id.*

Secondly, Judge Price found that the debtor's claim that he transferred the property's title to his sister in order to fullfill his parents intent to give her a dowry and because he, himself, was marrying a non-Greek, was simply "incredible." *In the Matter of H. Tesmetges*, slip op. at 12. Judge Price noted how seemingly odd it was that the debtor, supposedly an experienced real estate broker, would transfer the property to his sister for no consideration, without telling her of the second mortgage, and moreover, for the two of them, to permit the property to sit idle, unrented and unused for so many years.

Thirdly, Judge Price found the debtor's contention that he had continued making payments on the property from 1965 to

---

**1.** There is much testimony in the trial record concerning the importance of the Greek custom of insuring that a daughter receive a dowry or "prika" when she marries. Indeed, the debtor has maintained throughout the trial and on appeal that his sole reason for ever receiving legal title to the property from his parents and ultimately transferring it to his sister was to complete his parents dowry or "prika." However, Judge Price found the facts to be otherwise and as is discussed herein, this Court may not say that his findings were clearly erroneous.

1983 in order to fulfill his parents' dowry to his sister and that the monies for the payments had come from his mother's Social Security checks, were similarly "incredible." *In the Matter of H. Tesmetges,* slip op. at 25. As Judge Price observed, in order for him to believe that the mother's monthly checks of $313 were used to cover "all her expenses, including the heating for [her] twelve room house, and the monthly payments to Greenpoint Savings Bank [the first mortgage], I would have to suspend all common sense." *Id.* at 25. The judge went on to note that "the debtor's story is contradicted not only by common sense but other portions of his testimony." *Id.* For example, how could the debtor have used his mother's checks while he himself was listing her as a dependent for tax purposes? Or, for example, why did the debtor not list his alleged obligation to pay on the first mortgage when he filed for bankruptcy, and yet still continue making those payments while he was "bankrupt?"

Finally, Judge Price concluded that even though there was no concrete evidence of an understanding between the debtor and his sister, one must have existed between them. *In the Matter of H. Tesmetges,* slip op. at 34–35. Judge Price noted that it was "only under this theory" that an implicit understanding existed did the facts and behavior of the debtor and his sister make any sense. Thus, because of the facts highlighted above as well as those in the record, Judge Price concluded that the monies paid from the debtor's own resources, totalling $18,559.95, during the period from October 1972, the month after he transferred title to his sister, until November 1983, the month before the trial, should be awarded to the Trustee as an equitable lien on the property. The monies consisted of payments made on the first mortgage and on real estate and property taxes.

## Discussion

### A. Standards of Review

In an appeal from a bankruptcy court's decision, a district court applies two different standards of review: one for findings of fact; the other for conclusions of law.

For findings of fact, Rule 8013 of the U.S. Bankruptcy Rules provides that this Court "shall not" set them aside unless clearly erroneous. This "clearly erroneous" standard also applies to the bankruptcy judge's inferences drawn from facts. *Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 103–04 (3d Cir.1981); *In re Hygrade Envelope Corp.,* 366 F.2d 584, 587–88 (2d Cir.1966). Although appellants spent much of their brief attempting to reargue Judge Price's findings of fact, this Court finds no reason to hold that his findings of fact were clearly erroneous, and indeed, having reviewed Judge Price's decision based on three days of trial and briefs on appeal, Judge Price is to be commended for the care he took in unraveling the chronology of events and associated documents.

As for conclusions of law, Rule 8013 provides the district court with the discretion to "affirm, modify, or reverse" the lower court's conclusions of law. When a bankruptcy judge's conclusions are challenged, the district court "must make an independent determination of the applicable law." *Matter of Pacific Far East Line, Inc.,* 458 F.Supp. 771, 774 (N.D.Cal.1978), *aff'd in part, rev'd in part, on other grounds,* 654 F.2d 664 (9th Cir.1981); *see also Espiefs v. Settle,* 14 B.R. 280, 283 (D.N.H.1981); *Prudential Credit Services v. Hill,* 14 B.R. 249, 251 (S.D.Miss.1981); *In re Hollock,* 1 B.R. 212, 215 (M.D.Pa. 1979).

Having found that Judge Price's findings of fact were not clearly erroneous, we turn now to review independently his conclusions of law which the appellants now challenge on two grounds. First, they argue that it was an error of law to grant the Trustee an equitable lien on the property legally owned by Mary Lombard. Second, even if the award of the lien is affirmed, they argue that it was error to fail to impose New York's six year statute of limitations for equity actions; had this statute been properly applied, appellants claim, the lien would only include the contribu-

tions made by the debtor within the six years prior to the present action.

## B. *The Equitable Lien*

■ Under 11 U.S.C. § 541(a)(1), the commencement of a bankruptcy proceeding creates title in an estate comprised of all the legal and equitable interests of the debtor with some exceptions not relevant here. The decision as to what assets are considered to be legal or equitable interests is determined by reference to the state's law in which the property is located. *Butner v. U.S.*, 440 U.S. 48, 54 & n. 9, 99 S.Ct. 914, 918 & n. 9, 59 L.Ed.2d 136 (1979). Thus, in the present case, Judge Price properly looked to New York State law to determine whether the debtor had retained an equitable interest in the property legally held by his sister.

■ An equitable lien is a right to charge specific property or its proceeds with the payment of a particular debt; it does not give the lienor a possessory inter-·est nor a basis for a possessory action. *Goldrick v. Goldrick,* 99 Misc.2d 749, 417 N.Y.S.2d 410, 415 (Sup.Ct.1979); 35 N.Y. Jur. Liens § 12 (1964; Cum.Supp.1984). Under New York law, an equitable lien may arise by implication from the circumstances or an implied agreement in which the party claiming the lien stood in a confidential relationship with the legal owner and made payments for the purchase, preservation or enhancement of the property. *See generally* 35 N.Y.Jur. Liens § 12, 15–16. This is particularly so where the person claiming the lien has made payments from his or her own funds for closing costs, reduction of the mortgage and improvements on the property. *E.g., Goldrick v. Goldrick,* 417 N.Y.S.2d at 415 (wife who made types of payments specified above on property held in husband's name, was granted an equitable lien); *Ba-*

*dami v. Badami,* 29 A.D.2d 645, 286 N.Y. S.2d 590 (2d Dep't 1968) (wife also made same payments as above on property held in husband's name, was granted an equitable lien); *Towner v. Berg,* 5 A.D.2d 481, 172 N.Y.S.2d 258 (3d Dep't 1958) (stepfather who also made some payments as above on property held in his stepson's name, was granted an equitable lien). Where the amount of the expenditures made by the person claiming the lien does not constitute the whole purchase price, the amount of the lien will be measured by the amount expended. *E.g., Marum v. Marum,* 21 Misc.2d 474, 194 N.Y.S.2d 327, 329 (Sup.Ct.1959); *Petrukevich v. Maksimovich,* 1 A.D.2d 786, 147 N.Y.S.2d 869 (2d Dep't 1956).

Notably in the absence of a confidential relationship and circumstances demonstrating an implied agreement, the courts have not been willing to award an equitable lien. *E.g., Matco Electric Co. v. Plaza Del Sol Construction Corp.,* 82 A.D.2d 979, 440 N.Y.S.2d 407, 409 (3d Dep't 1981); *Anderman v. Street Realty Corp.,* 60 Misc.2d 437, 303 N.Y.S.2d 474, 477 (Sup.Ct.1969); *Billson Housing Corp. v. Harrison,* 26 Misc.2d 675, 205 N.Y.S.2d 387, 389 (Sup.Ct. 1960). The cases just cited all involve liens by contractors who had failed to file under the appropriate mechanics' lien statute and as a consequence were attempting to reclaim some of their expenditures by applying for an equitable lien even though other remedies, such as an action in quantum meruit, were also available to them. Notably also in cases involving persons who stand in confidential relationships such as spouses or close relatives, an action for an equitable lien is sometimes their only remedy.[2] Even though actions for constructive trusts also often involve persons who stand in confidential relationship to each other, these actions are primarily intended to rec-

---

**2.** *See supra* cases cited in previous paragraph cited above; *and see* 35 N.Y.Jur. Liens § 15 which states:

> There are many instances where equity will enforce a lien upon property without an express agreement of the parties. *This is an application of general equitable principles to a*

> *situation in which there might otherwise be no relief to the injured party.* The doctrine giving use to an equitable lien is an application of the maxim that equity regards as done that which ought to be done.

(emphasis added; notes omitted).

tify fraud, *Saulia v. Saulia*, 31 A.D.2d 640, 295 N.Y.S.2d 980, 982 (2d Dep't 1968), rather than merely preventing unjust enrichment as is intended by actions for equitable liens.[3]

The third requirement for awarding an equitable lien is the finding of an agreement based on an oral promise to convey or implied from the circumstances. Equitable liens have been awarded on the basis of evidence that an oral agreement to convey the property existed between the legal owner and the person making the expenditures. *E.g., Goldrick v. Goldrick*, 417 N.Y.S.2d 410; *Badami v. Badami*, 286 N.Y.S.2d 590; *Marum v. Marum*, 194 N.Y.S.2d 327; *Petrukevich v. Maksimovich*, 147 N.Y.S.2d 869. Even where a party has failed to prove that an oral promise existed, the court has still recognized the right of the plaintiff to prove his or her action for an equitable lien by proof derived from the circumstances. *Collucci v. Collucci*, 86 A.D.2d 644, 447 N.Y.S.2d 22 (2d Dep't 1982), *rev'd on other grounds*, 58 N.Y.2d 384, 460 N.Y.S.2d 14, 446 N.E.2d 770 (1983).[4] In the case of *Towner v. Berg*, the court contrasted the behavior of the son as the legal owner who had abandoned the property with that of the stepfather who had made all the payments on the property and determined that their behavior was a tacit confirmation of an arrangement. 172 N.Y.S.2d 258, 265 (recognized stepfather's right to assert the lien; remanded for a new trial with instructions that behavior and circumstances were permissible as proof of an implied agreement).

Appellants cite numerous cases to support their argument that the Bankruptcy Judge erred by inferring that an implied agreement existed between the debtor and his sister to share in the proceeds of the property if it were to be sold. In particular, they claim that the present case is directly on point with *Scivoletti v. Marsa-*

*la*, 61 N.Y.2d 806, 473 N.Y.S.2d 949, 462 N.E.2d 126 (1984). In that case the award of an equitable lien was denied to a son-in-law who had lived in and made tax and mortgage expenditures on his mother-in-law's house for some thirty years, but on her death had left the house to another daughter. The Court of Appeals, in *Scivoletti*, reasoned that despite the son-in-law's "sincere expectations" that he would be reimbursed, the record failed to reveal the existence of any implied promise to convey, reimburse, or grant a lesser interest in the property. Appellant's reliance on *Scivoletti* is wholly misplaced because they assume contrary to the record below, that no implied agreement was found by Judge Price. Alternatively, they argue that Judge Price's inference of an agreement was "sheer speculation."

As discussed in the section above on standards of review, inferences from facts are subject to the "clearly erroneous" standard. Because this Court finds that Judge Price's inference of an implied agreement was neither "sheer speculation" nor clearly erroneous, the *Scivoletti* case, *a fortiori*, does not apply to this case.

■ Having reviewed the legal requirements for awarding an equitable lien, we hold that the facts as Judge Price found them more than adequately support his inference of an implied agreement which may legally be said to give rise to the lien he awarded. New York case law indicates that the debtor and his sister could be found to have a confidential relationship with each other. Moreover, case law also indicates that the debtor made payments on the property of the type that have been found to give rise to equitable liens. Finally, the circumstances under which his sister received legal title, that is, for no consideration and without any burden to pay taxes or the mortgage, are certainly of the kind

---

**3.** *See* 35 N.Y.Jur. Liens § 15 (quoted supra n. 2)

**4.** It might be noted here that appellants in their reply brief slightly misrepresent the holding of the Court of Appeals in *Collucci*. Appellants state that the Court of Appeals overruled the Appellate Division's award of an equitable lien

where the Trial Court had not found one. This much is true; however, what appellants fail to add is that the Court of Appeals gave the party leave to enter evidence at the Trial Court level of proof in order to preserve his equitable lien.

from which New York courts are willing to infer that an implied agreement must have existed between the parties.

## C. *The Statute of Limitations*

Under 11 U.S.C. § 108(a), a Trustee in bankruptcy may commence an action on behalf of the debtor's estate only before the end of the period fixed by the "applicable law" for bringing such an action.[5] In the present action, the applicable period of law for the bringing of an action in equity is provided by New York's CPLR § 213(1) which allows six years for the bringing of actions "for which no limitation is specifically prescribed by law." N.Y. CPLR § 213(1) (McKinney 1972); *see also id.,* J.M. McLaughlin, Prac. Commentaries C213:1,9 (1972) *and* Supp.Prac. Commentaries C213:9 (1977); *Goldrick v. Goldrick,* 417 N.Y.S.2d at 415 (if party were to file equitable lien action, six year period would apply).

New York courts have ruled that in claims for the creation of a constructive trust which are similar to actions for an equitable lien, in that both have no applicable limitations prescribed by law and rely essentially on the courts equity powers, the six year statute of limitations for the cause of action does not begin to run until a demand for the property or share in the property is made and rejected. *E.g., Warren v. Warren,* 82 A.D.2d 881, 440 N.Y. S.2d 310 (2d Dep't 1981) (couple had savings account in husband's name to which wife stopped contributing in 1969; her action in 1976 demanding her share that accrued up until 1969, was held timely); *Mann v. Mann,* 77 A.D.2d 866, 431 N.Y. S.2d 63 (2d Dep't 1980) (wife conveyed certain property to husband in 1967; although subsequently he assured her it was still their joint property, in 1975, he filed the deed in his name; her action in 1979 de-

manding her share was held timely); *Augustine v. Szwed,* 77 A.D.2d 298, 432 N.Y. S.2d 962, 965 (4th Dep't 1980) ("the cause of action accrues when the acts occur upon which the claim of constructive trust is predicated, [that is] the wrongful withholding. (cites omitted)"). As explained in *Bey Construction Co. v. Yablonski,* it does not matter if the transfer of property "did not constitute a per se wrongful act," but rather "the cause [ ] of action stem[s] from the alleged breach of the implied trust relation and necessarily, it is the time when the relationship was allegedly breached that marks the beginning of the period of limitations." 76 A.D.2d 875, 428 N.Y.S.2d 728, 729 (2d Dep't 1980).

The debtor and defendants on appeal first argue that the Trustee's action should have been ruled untimely because it is essentially a fraud action and thus, the two year statute of limitations for fraud, running from the time of discovery, should have applied. This Court need not address this argument because Judge Price already ruled that the Trustee had dropped his fraud action.

■ As a second tactic, appellants argue that even if they assume *arguendo* that Judge Price was correct in finding the Trustee's action to be timely, the recovery on the lien should be limited to no more than six years of payments, running from the Trustee's filing in February of 1982 back to February of 1976. For this proposition, they rely on *Rubino v. Empire Heating Co.,* 205 N.Y.S.2d 562, 564 (Sup. Ct.1960). The *Rubino* case involved a shareholder suit against a director and officer who had committed recurrent and continuing wrongs for his personal benefit and to the injury of the corporation for a ten year period; the court limited the recovery period to the last six of those ten years.

---

5. 11 U.S.C. § 108(a) states:
   If applicable law ... fixes a period within which the debtor may commence an action, and such a period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of—

   (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; and
   (2) two years after the order for relief.

While the *Rubino* case seems to contradict Judge Price's holding, this Court finds that it does not and if anything, shows that his holding correctly applied New York law. *Rubino* merely places the six year limit and the time for which recovery for the ten years of wrongful acts may be had. In the present case, no wrongful acts or wrongful withholding occurred during the period in which his sister received and held legal title because as Judge Price found the debtor and his sister had an implied agreement. The period of "wrongdoing" or "wrongful withholding" only commenced at the time that the Trustee commenced the action in February of 1982 demanding the contributions the debtor had made during the time of their implied agreement. Alternatively, even if the period of wrongdoing began at the time the debtor filed for bankruptcy creating an estate in all his legal and equitable interests, in November of 1980, the Trustee's filing in February of 1982 and his subsequent amended complaint in March of 1983, both, would have been well within the six year statute of limitations. Finally, it should be underscored that the *Rubino* case does not stand for limiting the time period of recovery to six years. Many, if not all of the cases mentioned in the previous paragraphs, involved property interests that had been acquired or transferred under agreements ten or more years before the demand for return or a share of the property occurred.

#### D. *The Trustee's Cross-appeal*

Although the Trustee claims in his cross-appeal that he did not intend "to abandon" his action for a declaratory judgment to have the property declared to be the debtor's, Judge Price found that his declaratory judgment action was predicated on the Trustee's claim "under Section 544(b)— New York Debtor and Creditor" Law that the debtor had fraudulently conveyed the property to his sister. Since Judge Price

---

**6.** Judge Price pointed out that "at no time did the Trustee" make an "inappropriate" claim that the debtor conveyed property under Section 548(a) of the Code nor did the Trustee attempt to avoid the transfer on the basis of preferences

ruled in the bankruptcy proceeding that the Trustee had withdrawn this—his only fraud claim,[6] the Trustee, whether inadvertently or not, lost the underlying grounds for his declaratory judgment action. *In the Matter of H. Tesmetges*, slip op. at 29. Therefore, this Court does not find any merit in the Trustee's cross-appeal.

For the reasons discussed in the foregoing text, both the appeal and cross-appeal are denied and the decision of the Bankruptcy Judge affirmed.

SO ORDERED.

---

under Section 547, since the transfer was made more than one year (Section 548(a) ) before the Trustee's filing of his complaint and more than 90 days (Section 547) before the debtor's filing of his petition.