John RIO, Jr.; et al,
Plaintiffs/Appellees,

v.

ARMY AVIATION CENTER FEDERAL CREDIT UNION, Defendant/Appellant.

Civ. A. No. 85V–1444–S.

United States District Court,
M.D. Alabama, S.D.

April 28, 1986.

Charles T. Reese, Daleville, Ala., for plaintiffs/appellees.

Ernest H. Hornsby, Dothan, Ala., for defendant/appellant.

## OPINION

VARNER, District Judge.

This cause is now before the Court on an appeal of a bankruptcy Order issued by Hon. A. Pope Gordon, United States Bankruptcy Judge for the Middle District of Alabama.

The facts in this case are relatively straightforward and undisputed. On October 7, 1985, the Debtors herein, John Rio, Jr. and his wife, Avelina M. Rio, filed a petition under Chapter 13 of the Bankruptcy Code. At the time of the filing of the Chapter 13 petition, the Debtors had a checking account containing $1,400.14 at the Army Aviation Center Federal Credit Union (hereinafter referred to as "the Credit Union"). The Debtors also were indebted to the Credit Union in the amount of $2,064.00 which was payable in installments of $105.00 per month due on the second day of each month and issued checks totaling about $800.00, more or less.

On October 9, 1985, two days after the Debtors had filed for bankruptcy, the checks drawn by Mr. Rio against their account at the Credit Union were returned on the grounds that their account contained insufficient funds to clear the checks. Apparently, after the Debtors had filed bankruptcy, the Credit Union, upon advice of legal counsel, issued an "administrative hold" on the Debtors' checking account. From the record, it is not clear as to precisely when the hold went into effect, but an official of the Credit Union notified the Debtors of the freeze by letter dated October 10, 1985. The Bankruptcy Court noted that, as a result of the imposition of the hold, 22 checks that Mr. Rio had written were returned for insufficient funds. Moreover, the Court observed that the Credit Union imposed a setoff against the account for $10.00 for each returned check. This money was recredited to Debtors' account upon their filing suit therefor.

In response to the Credit Union's action, the Debtors filed suit in the Bankruptcy Court for the Middle District of Alabama seeking sanctions against the Credit Union for its willful violation of the automatic stay allegedly imposed by 11 U.S.C. § 362

and for contempt. The Debtors alleged that the action of the Credit Union violated 11 U.S.C. §§ 362(a)(4) and (a)(7). Section 362(a)(4) provides that the filing of a bankruptcy petition stays "any act to create, perfect, or enforce any lien against property of the estate." Similarly, § 362(a)(7) provides that the filing of a bankruptcy petition stays "the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor." The Debtors sought damages not only for the amount of financial loss they incurred as a result of the Credit Union's conduct, but also for the embarrassment, humiliation and distress they suffered as a result of having written checks that the Credit Union did not honor.[1] After trial held before Judge Gordon on October 23, 1985, the Bankruptcy Court issued an Order dated October 25, 1985, holding that the Credit Union willfully violated the provisions of 11 U.S.C. § 362 and that the Debtors were entitled to recover $750.00 in compensatory damages but were not entitled to recover punitive damages.[2] Furthermore, the Bankruptcy Court ordered that the Credit Union return to the Debtors any money that it had withdrawn from Debtors' account in conjunction with its imposition of the hold. Finally, the Bankruptcy Court ordered the Credit Union to pay attorneys' fees and ordered the Credit Union to notify all holders of the returned checks that money to honor the checks was on deposit at the time the checks were presented.

This appeal presents the alleged errors in this Order.

The Bankruptcy Court reasoned that, although a two-to-one majority of the Bankruptcy Appellate Panel of the Ninth Circuit in *In re Edgins*, 36 B.R. 480 (U.S. Bankruptcy Appeal 9th Cir.1984) held that the placing of a hold on a checking account does not violate the automatic stay, the facts of *Edgins*, for the most part, can be distinguished from the situation herein. In *Edgins*, the bank upon learning of debtor's bankruptcy froze his account and permitted no withdrawals. According to the Court in *Edgins*, this activity did not violate the automatic stay because it did not act so as to create, perfect or enforce a lien nor did it serve to setoff funds in the account. *Edgins*, supra, at 483. Moreover, the Court in *Edgins* noted that the Bankruptcy Code actually countenanced the bank's action. The Court reasoned that § 553 of the Code preserves the right of a creditor to setoff[3] and said creditor is protected by § 542(b) of the Code, which provides, in pertinent part:

> "* * * [A]n entity that owes a debt that is property of the estate * * *, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be an offset under Section 553 of this title against a claim against the debtor."

The Court also noted that the right is protected by § 363 which indirectly denies the debtor the right to use cash collateral without first obtaining Court authority and after notice and hearing.[4]

---

1. It was the position of the Debtors that the action of the Credit Union resulted in their receiving notices of criminal prosecution against them, suspension of check-cashing privileges at the Post Exchange, Commissary and other facilities at Fort Rucker and Fort Campbell, and it forced Debtors to sell some of their personal property, including savings bonds. The Debtors further claim that they incurred expenses on long distance phone calls which arose out of their attempt to remedy the situation with the holders of the checks.

2. The Court declined to award punitive damages on the grounds that, in its opinion, the Credit Union acted in good faith when it imposed the administrative hold.

3. Section 553 provides: "Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of this case * * *."

4. Title 11 U.S.C., § 363(c)(2), however, refers to a trustee's use of cash collateral as follows: "(2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions

Given the fact that the filing of a bankruptcy petition does not deny the creditor a right to setoff, the Court in *Edgins* recognized the need for setoff to preserve the creditor's right within the constraints of the automatic stay. It, accordingly, ruled that an administrative freeze effectively serves to protect the creditor's legal interest in the cash account while not allowing the creditor to alienate the collateral.

Distinguishing the case herein from the facts in *Edgins*, the Bankruptcy Court below first observed that the Credit Union did not merely put a hold on the Debtors' account but it actually withdrew funds from the account to satisfy the costs of processing the uncleared checks. This was simply a book transaction, affected as an emergency measure and remitted before the Court ruled on it. Secondly, the Court below noted that the limitations of § 363(c), which prohibits use of the debtor's cash collateral without approval of the Court, did not apply to the case herein because such limitation concerned only the debtor who was engaged in business. As the record indicates, the assets of the Debtors herein had not been used for business purposes and § 363 applies only to use by the trustee. Third, the Bankruptcy Court concluded that, unlike the *Edgins* case, the Credit Union did not have a lien on the checking account at the time of the filing of the bankruptcy petition and resultingly was not entitled to adequate protection under § 363(e).[5] Moreover, the lower Court noted that it was not necessary to determine whether the Credit Union was secured or unsecured because, under the Chapter 13 Plan, the Credit Union was promised payment in full. *United States v. Reynolds*, 764 F.2d 1004 (4th Cir.1985). Thus, in the opinion of the Bankruptcy Court, the reasoning of *Edgins* was not applicable because the Credit Union had removed funds

from the checking account and because the Credit Union did not have a security interest in funds that the Debtors had the right to control.

The Bankruptcy Court below heavily relied on an opinion, *Reynolds*, supra, in which the Fourth Circuit ruled that the action of the Internal Revenue Service in retaining the debtors' tax refund was a setoff subject to the automatic stay; accordingly, the Internal Revenue Service had violated the automatic stay in retaining the funds. *Reynolds*, supra, at 1007. In reaching this conclusion, the Court in *Reynolds*, adopted the reasoning of *United States v. Norton*, 717 F.2d 767 (3rd Cir. 1983), in which the Third Circuit drew analogies from the situation involving a bank's imposition of a freeze on a checking account to the case of the Internal Revenue Service's withholding the bankrupt debtor's tax refund. Both courts reached the conclusion that the withholding of the tax refund, just like the imposition of a freeze on a checking account, would reduce the chances of the debtor's successful rehabilitation and was in direct contravention of the policy underlying the automatic stay provision.

In its appeal of the Order of the Bankruptcy Court, the Credit Union seeks reversal on the grounds that it had a lien at the time of the Debtors' bankruptcy and that the Credit Union had a right to preserve the right to enforce said lien in bankruptcy by means of the imposition of an "administrative hold". Relying on *Edgins*, the Credit Union has argued that, the charges for the bad checks having been remitted, the hold on the checking account is the proper means by which the Credit Union can exercise its right to a setoff, yet still comply with the automatic stay provisions of the Bankruptcy Code. In support of its argument, the Credit Union further relies

---

of this section." Cash collateral includes money in a checking account, 11 U.S.C. § 363(a). It is the position of the. Debtors that § 363(c)(2) is not applicable to the case herein because the scope of its coverage is limited to the debtor who is engaged in business. See *infra* p. 141.

**5.** The Court below noted that, pursuant to ¶ 6 of the credit plan, the Credit Union possessed a

lien if the Debtors were in default or if the Credit Union had determined that the status of the Debtors had changed so as to adversely affect their ability to repay the loan. Concluding that neither of these two conditions precedent took place, the Bankruptcy Court concluded that the Credit Union did not have a security interest in the checking account.

on *Kenney's Franchise Corp. v. Central Fidelity Bank, N.A., Lynchburg,* 22 B.R. 747 (W.D.Va.1982), a case which holds that a bank's action in imposing an administrative freeze on a debtor's checking account pending resolution of its right to setoff did not constitute a violation of the automatic stay. *Kenney's,* supra, at 749.

In reviewing findings of facts, Rule 8013 of the United States Bankruptcy Rules provides that this Court "shall not" set them aside unless clearly erroneous. Rule 8013, Federal Rules of Bankruptcy. This Court recognizes the better opportunity of the trial judge to see and hear the witnesses. This "clearly erroneous" standard also applies to the bankruptcy judge's inferences drawn from facts. *In re Tesmetges,* 47 B.R. 385 (E.D.N.Y.1984). In reviewing conclusions of law of the Bankruptcy Court, this Court has the discretion to "affirm, modify or reverse" the lower court's conclusions of law. Rule 8013, Federal Bankruptcy Rules. When a bankruptcy judge's conclusions of law are challenged, as they are herein, the district court "must make an independent determination of the applicable law." *Tesmetges,* supra, at 388.

■ To the extent that the lower court's ruling (that, under the credit plan between the parties herein, the Credit Union did not have a lien on the Debtors' checking account at the time of the filing of the bankruptcy petition) was a determination of fact, this Court has reservations that there were clearly erroneous findings of fact. As pointed out by the Bankruptcy Court, the Credit Union had a lien if the Credit Union had determined "that there has been a substantial adverse effect on the ability to repay of any of the undersigned as a result of a change in status or * * *" [Credit Plan, ¶ 6]. That Court's Order found that:

"There was no evidence that the credit union made a determination that there was a change in the status of the debtor that would adversely affect his ability to repay the loan * * *." [at p. 16].

This Court disagrees as a matter of law. A "determination" is "the act of coming to a decision; the fixing or settling of a purpose". AMERICAN COLLEGE DICTIONARY [Random House, 1970]. It is a mental process, not unlike an intent. A determination, like an intent, may ordinarily not be proved directly because there is no way of fathoming or scrutinizing the operation of the human mind. One's statement of his determination is barred as evidence as a self-serving statement. One's determination, like his intent, must be determined from the surrounding circumstances. The Bankruptcy Judge's finding that "[t]here was no evidence that the Credit Union made a determination * * *" overlooked, in this Court's opinion, the only substantial evidence on the subject. There admittedly were the facts: (1) That an installment payment was due from Debtors on a debt of over $1,000.00 to the Credit Union on October 2, 1985; (2) that the October 2 payment was not made; (3) that the Debtors filed a petition in bankruptcy [albeit a Chapter 13 Petition] on October 7, 1984; (4) that the Credit Union had authority to apply deposits of Debtors to the debt upon determination by the Credit Union that there has been a substantial adverse effect on the ability to repay as a result of a change of status of Debtors; and (5) that, within a short time of the filing of the bankruptcy proceedings by Debtors, the Credit Union notified Debtors that an administrative hold had been placed on Debtors' shares and accounts pending the bankruptcy proceedings. These undenied facts appear to this Court to demand the conclusion that the Credit Union made the determination that the Debtors' bankruptcy indicated a status change having a substantial adverse effect on Debtors' ability to repay the debt in question. Indeed, it is difficult to imagine stronger evidence thereof.

The Bankruptcy Judge sought strength for his finding, that there was no evidence of a determination, in the fact that the bankruptcy proceeding was filed pursuant to Chapter 13 of the Bankruptcy Code, that the Chapter 13 Plan provided for paying all creditors over a period of 36 months, and that the Credit Union had not looked at the Court file or proposed plan before freezing the debt. This Court is of the firm opinion that there is no occasion for bankruptcy,

even in its most pro-creditor form, other than to avoid or delay the payment of debts of the bankrupt. Bankruptcy, when compared to a status of a fluid credit plan with a credit union, necessarily indicates a change in the status of the debtor which would adversely affect his ability to repay a loan. The Chapter 13 Plan itself, had it been looked at by the Credit Union, showed a substantial proposed delay for payment of the Credit Union debt. Debtors had $1,400.14 on deposit and owed $2,064.00. The Chapter 13 Plan contemplated payment of all creditors within 36 months. Such a plan is no guarantee of payment and is clear indication of financial distress. It is inconceivable that a credit union would be expected to forego its options with a Chapter 13 bankrupt and continue to furnish open-end credit without securing its indebtedness.

Since the Bankruptcy Court found no evidence of a determination, this Court is of the opinion that such a finding was erroneous as a matter of law. That Court's finding that there was no determination, based on the absence of evidence, if a finding of fact, was, in this Court's opinion, plain error.

■ The law of Alabama provides that, in certain situations, notwithstanding the absence of a written security agreement, a financial institution may be entitled to a "banker's lien" on deposits at the institution. The banker's lien was vaguely called to the attention of the Bankruptcy Judge [Tr. 15] but it was not discussed in his Opinion. A banker's lien attaches in favor of the bank on the "securities and moneys of the customer deposited in the usual course of business, for advances made on his credit or for existing indebtedness of the depositor to the bank" [citations omitted]. *Get It Kwik of America v. First Alabama Bank of Huntsville*, 361 So.2d 568 (Ala.Civ.App.1978). To justify the lien, it must appear that the deposit was general and that credit was given on the faith of the deposit then on hand. *Bank of Guntersville v. Crayter*, 199 Ala. 599, 75 So. 7 (Ala.1917); 9 C.J.S. *Banks & Banking*, § 309. In the absence of any specific direction or agreement, express or implied, that it be special, a deposit is considered to be general. *Kaufman v. First National Bank of Opp, Alabama*, 493 F.2d 1070, 1072 (5th Cir.1974). From the information before this Court, it appears that the Debtors' checking account was not designed for any special purpose and that it was a general account. Furthermore, as the credit plan indicates, the Credit Union made the loan to the Debtors in light of the fact that the Debtors maintained said deposits on account at the Credit Union. The credit plan explicitly declares that shares and deposits are security for the credit. [Defendant's Exhibit 1, ¶ 7]. In granting the loan to the Debtors, the Credit Union has satisfied the two-prong test of *Bank of Guntersville*, supra, and, therefore, reserved for itself a banker's lien upon the Debtors' checking account. Accordingly, this Court finds that the Bankruptcy Court was in error in not concluding that the Credit Union had a banker's lien on the Debtors' checking account at the time the Debtors filed for bankruptcy.

As the holder of a security interest in the checking account of debtor who has filed for bankruptcy, the Credit Union has a right of setoff against the Debtors. 11 U.S.C. § 553. At a minimum, the right of setoff assures the Credit Union that the money in the checking account will not be transferred from ·the Credit Union to the bankruptcy trustee. 11 U.S.C. § 553. It also appears that the Credit Union is entitled to some sort of assurance that interest in the account will be protected. See, *Edgins*, supra, at 483–484. Nevertheless, the Credit Union is entitled to setoff only debts predating filing of bankruptcy proceedings. 11 U.S.C. § 362(a)(7).

This Court recognizes that there is a need to balance the interests of the Debtors in assuring that the Credit Union does not violate the provisions of the automatic stay with the need of the Credit Union to preserve its interest in the checking account. Although the Third and Fourth Circuits in *Norton* and *Reynolds*, respectively, have stated **in dicta** that the balance can be met by denying the bank the right to impose an administrative stay, this Court is

of the opinion that the reasoning of the aforesaid cases is not applicable to the facts herein. Indeed, in both *Norton* and *Reynolds,* the United States, as a creditor, had completely withheld tax refunds from the debtors; that is, the United States exercised its dominion over the money of the debtors without making a showing that it had a legal interest in the money.

In the case at bar, the Credit Union put a hold on the Debtors' account, and the money that the Credit Union withdrew for purposes of covering the service charge on bounced checks had been returned to the Debtors before the Bankruptcy Court below issued its Opinion. The Debtors' issuance of 22 checks on funds in the hands of a creditor was, itself, a highly suspect operation.[6] This Court is of the opinion that the imposition of the administrative hold on the account of the Debtors was a reasonable means by which the Credit Union could assure that the Bankruptcy Court's options would be preserved and that the Credit Union's right in the collateral would be adequately protected. See, *Edgins,* supra; *Kenney's,* supra.

Accordingly, the Opinion of the Bankruptcy Court will be reversed and the proceeding will be remanded to the Bankruptcy Court for proceedings not inconsistent herewith. An Order will be entered in accordance with this Opinion.

---

**6.** What duty a bank may have to general creditors not to alienate funds of a bankrupt by payment of checks issued by the bankrupt has not been briefed by the parties or considered (apparently) by the Bankruptcy Court. It appears to this Court that, independent of any right to setoff, a bank's freezing of deposits of a bankrupt pending court order is a valid protection of the bankrupt estate.